## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**,

v.

**SHANE BROWNE**,

Defendant.

Case No. 1:17-cr-241 (TNM)

## <u>MEMORANDUM ORDER</u>

A jury convicted Shane Browne of kidnapping and possession with intent to distribute marijuana.  Browne moved for a new trial and judgment of acquittal, which this Court denied. The D.C. Circuit affirmed, but it remanded for development of a factual record on Browne's ineffective-assistance claims.  The Court held an evidentiary hearing, receiving testimony from Browne, his trial attorneys, and several other witnesses.  Considering the now-developed record, the parties' briefing, and their arguments at the hearing, the Court denies Browne's motion for a new trial.

## I. BACKGROUND

Police arrested Browne in December 2017 for armed kidnapping.  A Lyft driver named Ulises Flores reported that Browne requested a ride from Washington, D.C., to Aberdeen, Maryland, and then forced Flores at gunpoint to make the return trip.  When police eventually searched Browne's apartment, they discovered 78 pounds of marijuana and $36,000 in cash, but no firearms.  A grand jury returned a superseding indictment charging Browne with seven counts:  Kidnapping in violation of 18 U.S.C. § 1201(a)(1) (Count One); Possessing a Firearm During a Crime of Violence in violation of 18 U.S.C. § 924(c)(1) (Count Two); Unlawful

Possession with Intent to Distribute Marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D) (Count Three); Kidnapping while Armed in violation of D.C. Code §§ 22-2001, 4502 (Count Four); two counts of Possession of a Firearm During a Crime of Violence in violation of D.C. Code § 22-4504(b) (Counts Five and Seven); and Assault with a Dangerous Weapon in violation of D.C. Code § 22-402 (Count Six).

A jury convicted Browne on Counts One and Three.  He then moved for a new trial and judgment of acquittal, *see* Mot. for New Trial or Acquittal, ECF Nos. 63 & 64, which this Court denied, *see* Mem. Order, ECF No. 76.  Browne appealed.  *See United States v. Browne*, 953 F.3d 794 (D.C. Cir. 2020).  On appeal, the D.C. Circuit found he made "colorable" ineffective-assistance-of-counsel claims and remanded to this Court for development of a factual record.  *Id.* at 804.  The motion is now ripe for resolution.

## II. LEGAL STANDARDS AND CREDIBILITY FINDINGS

The Sixth Amendment guarantees a right to counsel in criminal proceedings.  *See Gideon v. Wainwright*, 372 U.S. 335 (1963).  That promise goes unfulfilled where defense counsel's "conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

To succeed on a *Strickland* claim a defendant must make a two-part showing.  *First*, he must show that his "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.  *Second*, he must show those errors prejudiced his defense—that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  Reviewing courts generally "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *United*

*States v. Mohamed*, 863 F.3d 885, 889 (D.C. Cir. 2017) (quoting *Strickland*, 466 U.S. at 689). And "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

When a defendant asserts his Sixth Amendment rights for the first time on appeal, most often "the relevant facts will not be part of the trial record." *United States v. Rashad*, 331 F.3d 908, 909 (D.C. Cir. 2003). So the typical practice in this circuit is to "remand the claim for an evidentiary hearing." *United States v. Fennel*, 53 F.3d 1296, 1304 (D.C. Cir. 1995).

*      *      *

This Court held a two-day evidentiary hearing to develop a record on the effectiveness of Browne's trial counsel. The parties offered several witnesses: Browne himself testified, as did his defense attorneys, Sean Farrelly and Jason Kalafat; his friend, Jordan Keslow, who spoke with the Defendant by phone during the alleged kidnapping; and his then-girlfriend, Kathryn Impellizzeri, who also spoke to Browne by phone and text on that night. Browne also introduced voluminous cellular records showing his phone activity during the offense.

Considering the testimony and evidence adduced at that hearing, the Court makes the following general credibility findings relevant to its analysis:

- Jason Kalafat and Sean Farrelly are credible witnesses who gave well-supported testimony.

  - Both attorneys have extensive backgrounds in criminal law. When he represented Browne, Kalafat had participated in 87 criminal trials—a substantial portion of which were before a jury. Farrelly had roughly 60 trials—around ten of which were before a jury. Given this experience,

both attorneys are well-positioned to make strategic decisions about how to present a defense. And their testimony and demeanor on the stand suggested to the Court that they are skilled and knowledgeable professionals. This impression was buttressed by the Court's observations of both attorneys throughout the trial.

o   Although at times Kalafat and Farrelly did not recall specific details about their trial preparation and representation, those failures of memory are attributable to the passage of time ( about 5 years) and do not suggest dishonesty. When their memories failed, they gave more general testimony (e.g., noting that they spoke with a potential witness but failing to remember specifics). The Court credits that more generalized testimony as honest, though incomplete.

o   Neither Farrelly nor Kalafat are biased in a way that would affect their testimony. To be sure, these proceedings challenge the effectiveness of their representation. But both attorneys also expressed genuine affection for Browne and a belief he is innocent of the kidnapping charge. These interests crosscut, making it unlikely the attorneys would give dishonest testimony.

• Jordan Keslow's testimony was probative, though in parts incredible. Keslow's lifelong friendship with Browne gives him a clear reason to bend the truth—doing so could help the Defendant get a new trial and another shot at acquittal. The content of Keslow's testimony suggests he *did* at times distort the truth to aid

Browne.  For example, Keslow testified at the evidentiary hearing and in his declaration that he was unaware of Browne's work in drug trafficking.  The Court finds it implausible that Keslow, a lifelong friend and former roommate of Browne, would not know his friend trafficked drugs for a living.  When pressed on this point, Keslow had no explanation and his demeanor was evasive.  Given these credibility concerns, when Keslow's testimony conflicts with that of Browne's trial counsel, the Court credits trial counsel.

- Kathryn Impellizzeri likewise gave probative, though biased, testimony. Although Impellizzeri and Browne are no longer romantically involved, she testified that she still cares for him and wants to help his case.  Given that admitted bias, and having carefully observed her demeanor on the stand, where Impellizzeri's testimony conflicts with that of Browne's trial counsel, the Court credits trial counsel.

- Shane Browne's testimony was probative, though he was evasive at times and has a clear bias.  Browne has a strong incentive to distort the truth in these proceedings—doing so might secure him a new trial.  Throughout his testimony, Browne was evasive in discussing the details of his drug trafficking, seeking to downplay his role and cast himself as naïve.  For example, Browne testified that he first believed he was storing mass quantities of marijuana in suitcases for a legitimate cannabis business that had simply run out of storage space.  Given these credibility concerns, where Browne's testimony conflicts with that of his trial counsel, the Court credits trial counsel.  While Browne appears to be a

likeable and even gentle person, he did not appear to be a trustworthy one.  And

that is what matters here.

### III. ANALYSIS

Browne raises several grounds in support of his *Strickland* claim.  Considering each, the

Court finds he has not shown trial counsel's conduct was objectively unreasonable or even

erroneous.  And even if some strategic decisions were erroneous, Browne is not entitled to a new

trial because those errors did not prejudice his defense.

### A.

Browne's first argument is that Kalafat and Farrelly were ineffective in pretrial

preparation.  He says it was objectively unreasonable to (1) "barely" meet with him before trial;

(2) not "contact or subpoena three witnesses" who could offer exculpatory testimony; (3) not file

certain motions in limine excluding prejudicial evidence; and (4) never advise him of the

possibility of a blind plea to limit evidence of his drug-trafficking activities.  *See* Mot. for New

Trial (MNT) 24–28, ECF No. 133-1.  The evidence does not support these arguments.

### i.

Start with the first assertion—that counsel "barely" met with Browne before trial.  Both

attorneys state in sworn declarations that they met with him several times between his arrest and

trial.  *See* Opp. to MNT (Opp.), Ex. 1 (Decl. of Jason Kalafat) at 2 ("[W]e met with Mr. Browne

as often as was necessary and whenever Mr. Browne requested that we meet."); *id.* at 3

("Although we did not need to prepare Mr. Browne to testify, we continued to meet with him

regularly and keep him apprised of the status of his case."); *id.*, Ex. 2 (Decl. of Sean Farrelly) at

2–3 (detailing about seven pretrial meetings with the Defendant).  And those meetings were substantive, discussing with Browne the Defense's approach to the case.  *See* Evid. Hr. Tr. (Day 1) (Testimony of Jason Kalafat) 19:20–24 ("We discussed trial strategy I would say every meeting I had with Mr. Browne other than maybe in an initial meeting the first time I met with him."); *id.* (Day 2) (Testimony of Sean Farrelly) 7:15–17 ("And at all of these meetings we discussed substantive matters pertaining to the case.").

Browne says he never discussed trial strategy with counsel.  *See, e.g.*, *id.* (Testimony of Shane Browne) 110:4–6 ("Q: You stated . . . Mr. Farrelly and Mr. Kalafat didn't go over trial strategy with you. . . . A: Correct.").  The Court rejects that testimony.  As noted above, Browne has a clear incentive to downplay the adequacy of counsel's pretrial efforts.  And it appears Browne is doing so here—only moments after saying counsel did not discuss trial strategy with him, Browne testified that he "argu[ed] with [his counsel] about this whole sense of strategy." *Id.* at 110:8–9.  Both cannot be true.  Given this discrepancy, and the credibility concerns mentioned above, *see supra* Part II, the Court credits defense counsel's testimony that they met with Browne roughly seven times and discussed "substantive matters pertaining to the case." *Id.* (Testimony of Sean Farrelly) 7:15–17.  Browne has offered no evidence or precedent suggesting more meetings were necessary to adequately prepare him.[1]

Browne seems to believe the Sixth Amendment entitles him to as many meetings with counsel as he wants.  That argument is wrong as a matter of law but also completely unrealistic in the modern criminal justice system.  *Compare, e.g.*, *United States v. Mitchell*, 796 F. Supp. 13,

---

[1]  Browne testified at the evidentiary hearing that he wanted more time with counsel in the days before trial.  But he never expressed that interest because "there was a race riot in the D.C. Jail," meaning he "couldn't call."  Evid. Hr. Tr. (Day 2) 95:25–96:3.  Of course, it is not "objectively unreasonable" for trial counsel to not anticipate an unstated desire for more meetings.

16 (D.D.C. 1992) (finding no ineffective assistance where "trial counsel had three meetings with the defendant, . . . requested and received documentation, and reviewed the file and discovery materials for the case"), *with United States v. Bailey*, 2021 WL 5798045, at *3–4 (D.D.C. Dec. 7, 2021) (finding ineffective assistance where counsel admitted he had not met with defendant or prepared him for trial at all).  Most criminal defendants are represented by court-appointed defense attorneys with heavy docket loads.  Those attorneys represent their clients zealously and efficiently, but they must juggle many matters simultaneously.  It simply would not be possible for those attorneys to meet with a client whenever he wishes.  Browne, unlike most defendants, was fortunate—he retained not one but two well-regarded defense attorneys.  They met with him numerous times and kept him informed of the case.  On this record, the Court cannot say these pretrial meetings were constitutionally inadequate.

**ii.**

On to argument two—that trial counsel failed to "contact or subpoena three witnesses" who could offer exculpatory testimony.

Browne refers here to Keslow, Impellizzeri, and Bryant Sands, all of whom spoke to him at various times during his ride to and from Aberdeen.  He says Keslow would have contradicted Flores's account of the events preceding the alleged kidnapping.  *See* MNT 31.  Phone records showed Keslow and Browne were on the phone during the time when Browne threatened Flores to secure a return ride to the District, but Keslow would have testified that he never heard any dispute.  *See id.* ("Keslow says that Defendant and Flores *never argued* about Flores driving Defendant back to D.C., nor was there anything that would have indicated in the slightest that that happened." (emphasis in original)).  Similarly, Browne says Impellizzeri's testimony about their intimate conversation "would have made the inference that he was also holding a gun to

Flores' head [during the drive back] highly improbable." *Id.* at 32. And Sands—who spoke with Browne on the ride to Aberdeen—could have contradicted Flores' testimony that Sands and Browne discussed "email encryption" or the possibility of Browne going to jail, undercutting a suggestion of nefarious activity. *Id.* at 31–32.

An attorney's decision not to interview a potential witness is assessed for reasonableness under the circumstances, with a "heavy measure of deference" given to counsel's judgments. *Mohammed*, 863 F.3d at 890 (quoting *Strickland*, 466 U.S. at 691). Generally, counsel can decline to investigate a witness when he determines that any potential information the interview may uncover would have limited value. *See id.* (citing *United States v. McDade*, 699 F.3d 499, 507 (D.C. Cir. 2012)). But the "complete failure to investigate" an impeachment witness when counsel does not have any indication of what he may say is deficient. *United States v. Debango*, 780 F.2d 81, 85 (D.C. Cir. 1986); *accord Mohammed*, 863 F.3d at 891 ("Counsel did not and could not know what he would find out had he picked up the phone.").

Here, the Defense knew the substance of Keslow, Impellizzeri, and Sands's potential testimony. Farrelly testified that he spoke with Keslow "at least once, . . . maybe twice, before trial," Evid. Hr. Tr. (Day 2) 10:6–7, and directly asked about the call with Browne, *see id.* at 10:15–16. So too with Impellizzeri—Farrelly spoke with her "multiple times prior to trial," including about "the night of the incident."[2] *Id.* at 17:14–15. And although neither Farrelly nor

---

[2] Both Keslow and Impellizzeri say they were "never interviewed by trial counsel." MNT, Ex. 5 (Decl. of Jordan Keslow) ⁋ 10; *Id.*, Ex. 6 (Decl. of Kathryn Impellizzeri) ⁋ 7. There are two ways to read that allegation. The witnesses might be saying they never participated in a formal interview with counsel. The evidence does not support that allegation. Based on the facts noted above, counsel's conversations with the witnesses were clearly substantive. The Court will not quibble on semantics—*i.e.*, "conversation" vs. "interview." The Court credits trial counsel's impression of status of these interactions, not those of the lay witnesses. Or Keslow and Impellizzeri might mean that they never spoke with Farrelly or Kalafat *at all*. That assertion

Kalafat recalled interviewing Sands, they both knew Browne was on the phone on the way to Aberdeen.  *See id.* at 9:7–15; Evid. Hr. Tr. (Day 1) 36:5–9.  With that preliminary investigation, Farrelly determined these witnesses were of limited impeachment value.  *See id.* at 62:14 –18.

Considering their potential testimony, that was a reasonable judgment.  Keslow might have claimed he never heard Flores and Browne arguing.  But Flores testified that Browne just pointed a gun at him and said, "drive me back to D.C." in a "very normal" tone.  Trial Tr. 251:15, 253:10.  So there is no facial conflict between these accounts.  Similarly, Impellizzeri may have testified that Browne "introduced her to Flores in a friendly manner as the ride ended." MNT 32.  But that would not have undermined Flores's testimony because the driver never denied any such introduction took place.  And while it seems odd that Browne would discuss his romantic relationship with Impellizzeri "while pointing a gun at Flores," *id.*, it is entirely possible to do both at the same time.  So, again, no facial conflict.  In any event, Kalafat testified that Browne "unequivocally and specifically instructed me that he did not want to involve Katie."  Evid. Hr. Tr. (Day 1) 34:17–19.  The Court credits this assertion.  At the risk of stating the obvious, there is no constitutional deficiency in failing to call a witness the defendant says he does not want to call.

Lastly, Sands may have contradicted Flores's assertion that Browne mentioned "email encryption" or "going to jail" on the ride to Aberdeen.  But as Browne admits, it is likely Flores "confused crypto emails with cryptocurrency"—an innocent explanation for half of this apparent discrepancy.  MNT 31.  More, Sands only spoke with Browne on the ride to Aberdeen, meaning

---

would conflict with Farrelly's account.  And, based on the credibility findings above, the Court credits Farrelly's testimony.

he could not have contradicted Flores's account of the actual offense conduct.  That means Sands's would have been of only minor impeachment value and may not even qualify as a percipient witness under *Debango*.[3]

Having investigated these witnesses, and understanding their limited impeachment value, the Defense made a strategic decision not to subpoena them.  The Defense decided Browne would not testify, a tactical decision he does not question now.  As Farrelly explained:

[O]nce we knew [] it was likely that Mr. Browne was not going to testify and once we knew that . . . the Government's evidence quite frankly was not that strong as it pertained to the kidnapping, we had determined that the reasonable doubt defense was our best strategy. . . .

[M]y position, I think generally accepted in the criminal defense community, is if you're going with a pure reasonable doubt defense, you try to avoid at all costs presenting any evidence, whether it's physical evidence, testimony, et cetera.  You really want to avoid any scenario where a jury can sort of abandon the proof-beyond-a-reasonable-doubt standard and apply more of a preponderance or "which side do I believe more" type of deliberation.

---

[3]  It appears Browne acknowledges as much—he did not call Sands during the evidentiary hearing on this Motion.  So the only record evidence of Sands's potential testimony is his short declaration.  Without more, it is difficult to assess his credibility or determine his value as a potential impeachment witness.

Evid. Hr. Tr. (Day 2) 10:25–11:5, 13:20–14:3.  That's exactly the kind of informed tactical

decision *Strickland* says is "virtually unchallengeable."[4]  466 U.S. at 690–91.

Seeking to avoid this conclusion, Browne relies heavily on the D.C. Circuit's decision in

*Mohammed*, 863 F.3d 885.  There, an Afghani man was accused of trafficking drugs to finance

the Taliban.  *See id.* at 887.  The Government's case-in-chief rested on "two pillars"—recordings

of an informant's conversations with the defendant and the informant's trial testimony explaining

those conversations.  *Id.* at 888.  Before trial, Mohammed told his counsel that four witnesses in

Afghanistan could testify he was not involved with the Taliban.  *Id.*  The Government also

disclosed Mohammed's phone contacts in discovery, listing individuals in Afghanistan who

could testify to the informant's personal vendetta against the defendant.  *Id.* at 887.  But

Mohammed's counsel never pursued that evidence.  He "mistakenly believed he would need to

travel to Afghanistan to" investigate those potential leads and determined that doing so would

pose "insurmountable" difficulties.  *Id.* at 891, 888.  The Circuit found that "complete failure to

investigate" was ineffective representation.  *Id.* at 890 (citing *Debango*, 780 F.2d at 85).

But this case is nothing like *Mohammed*.  The Defense investigated Keslow, Impellizzeri,

and Sands.  It understood the potential impeachment value those witnesses might have.  Counsel

simply made an experience-based judgment that offering affirmative witness testimony would

undermine its efforts to point out the weakness of the Government's case.  *Mohammed* itself

---

[4]  During the evidentiary hearing, Browne's current counsel suggested Farrelly and Kalafat
believed putting on evidence would literally shift the burden of proof to the Defense.  *See* Evid.
Hr. Tr. 175:21–25 ("That trial tactic is facially ineffective.  It's in conflict with black-letter law
and appropriate jury instructions that there is no burden-shifting by a defendant by simply
offering [] rebuttal evidence or any evidence.").  There was no such mistake.  Farrelly's
testimony, quoted above, makes clear he was discussing criminal juries' tendency to weigh
evidence when presented with an affirmative defense case.

implicitly blessed that kind of judgment call.  *Cf.* 863 F.3d at 891 ("Counsel did not decide against investigating based on any reasoned anticipation that the evidence unearthed or testimony of anyone he might reach would be of limited value . . . .").   Without more, the Court cannot say the Defense's witness strategy was deficient.

### iii.

Now for arguments three and four—that counsel was ineffective in failing to seek exclusion of certain drug-trafficking evidence through a blind plea and motion in limine.  Here, again, the evidence shows counsel considered these options but made a strategic choice not to pursue them.

Kalafat and Farrelly discussed potential ways to exclude narcotics evidence, including through a blind plea and a motion in limine.  *See, e.g.*, Evid. Hr. Tr. (Day 1) 49 ("I did discuss [a blind plea] with Mr. Farrelly . . . .").  The Defense declined to pursue that strategy for three reasons.

*First*, Browne likely could not prevent the Government from introducing *all* cannabis evidence, because the kidnapping and drug-distribution charges were related.  *See id.* at 54 ("You're not going to keep it all out.").

*Second*, trial counsel believed presenting the jury with all 78 pounds of marijuana found at Browne's apartment would cast the Defendant as naïve, supporting the idea that he would not have committed a violent kidnapping.  *See id.* at 55 ("So if some of this is coming in, the absurdity of 78 pounds showing how naïve Mr. Browne was helpful."); *id.* at 64 ("And my thought was . . . we could make some hay with it . . . to portray Shane as sort of a naïve, young guy in over his head.").

And *third*, trying the narcotics charge would allow the jury to convict Browne on *something*, given that he was obviously involved in criminal activity.  *See id.* at 62:19–22 ("We also had made the decision to basically give Count 3 up as an offering to the jury to say, you know, this is something you can convict him of in the hopes again that they would acquit him on everything else.").

There's no basis to conclude this strategy was outside "the wide range of reasonable professional assistance."  *Mohammed*, 863 F.3d at 889.  Had Browne pled guilty to the narcotics charge, the Court likely would have denied a categorical motion in limine and allowed the Government to present much of its drug trafficking evidence anyway.  *Cf. Browne*, 953 F.3d at 803 (concluding this Court's "inference that the kidnapping was in furtherance of Browne's drug trafficking was entirely reasonable given the evidence before it").  The narcotics evidence was, after all, probative of Browne's motive in kidnapping Flores.  *See* Fed. R. Evid. 404(b)(2).  The Defense recognized this reality and declined to pursue a blind plea.  That strategy was reasonable on these facts.

By extension, counsel did not err in failing to advise Browne of the possibility of a blind plea.  Of course, "defense counsel has the duty to communicate formal offers from the prosecution . . . that may be favorable to the accused."  *Missouri v. Frye*, 566 U.S. 134, 145 (2012).  And an attorney must inform a defendant about the "'clear' and 'easily determined'" consequences of pleading guilty (or not).  *United States v. Aguiar*, 894 F.3d 351, 358 (D.C. Cir. 2018) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 368-69 (2010)).  But the prosecution never offered Browne a formal single-count plea on the marijuana charge.  That was just an idea from Browne's current counsel in support of his preferred trial strategy.  And there was nothing "clear" or "easily determined" about the consequences of that kind of plea.  It would have been a

dubious gamble hoping to exclude evidence with probative value, all at the cost of losing a "compromise" conviction. The Defense was not deficient for declining to advise Browne of that tact.

## B.

Browne also claims counsel's representation was constitutionally defective *during* trial. He says his attorneys did not offer potentially exculpatory phone records; failed to object to certain prejudicial evidence; and failed to ask for certain jury instructions or argue a defense theory. MNT 28–29.

Some of these arguments overlap in significant ways with those offered above, so the Court rejects them for similar reasons. The Defense decision to not blind plea on the marijuana charge is coextensive with its later decision to not object when the Government introduced voluminous marijuana evidence. Both were informed by the same strategic analysis—wholesale exclusion of the evidence was unlikely and a jury might draw some residual exculpatory inferences for the Defendant because of its ridiculous volume.[5] Likewise, the Defense's decision to not ask for a defense-theory instruction is coextensive with its decision to emphasize a reasonable-doubt defense instead of offering on affirmative evidence. The Court has already found those strategies to be reasonable.

Browne also questions the Defense not introducing his phone records into evidence. Those records show Browne extensively browsing D.C. escort services and pornographic websites during the time he was allegedly holding a gun to Flores's head. *See* MNT, Ex. 1

---

[5] In fact, introducing massive quantities of marijuana evidence may have cut *against* the Government. Members of the jury seemed to find its presence amusing—several jurors smirked when it was brought into the courtroom.

(entries 625–702).  He says some jurors "would have rejected, or even found ludicrous, Flores'

claim that Defendant pointed a gun at his head while . . . click[ing] through multiple erotic

websites for over a half-hour."  MNT 37.

The evidence shows trial counsel reviewed those phone records, *see* Opp., Ex. 1 (Decl. of

Kalafat) at 6; *id.*, Ex. 2 at 7 (Decl. of Farrelly), but counsel determined they were largely

cumulative of evidence that would be admitted in the Government's case-in-chief.  And, as with

defense witnesses, counsel determined introducing that added evidence was not worth

undermining its reasonable-doubt defense.  As Farrelly testified:

> [A]lmost all of that evidence, Jordan's testimony, Katie's testimony, the phone records,
>
> the 58 websites or whatever, all that would have done is corroborate facts that we knew
>
> were coming into evidence through the Government's case.  So again, the value would
>
> have been marginal at best, potentially of no value, evidentiarily. But we know if we put
>
> those into the record and called witnesses and entered exhibits, we know that we would
>
> then have put on a defense case and watered down our strategy.

Evid. Hr. Tr. (Day 2) 71:6–16.  The Court has already found that strategy to be reasonable in

general.

The Defense strategy was particularly reasonable as applied here.  A jury might have

drawn *inculpatory* inferences from Browne seeking out illegal prostitution.  Or it may have

inferred dishonesty from Browne seeking out escorts while telling Impellizzeri he wanted an

exclusive relationship.[6]  And, of course, it is entirely possible to scroll one's phone while holding

---

[6]  Indeed, a defendant's unfaithfulness or inclination to watch pornography are exactly the kinds
of evidence defense attorneys routinely seek to exclude as unduly prejudicial.  *See* Fed. R. Evid.
403.

something in the other hand (like a gun).  So the phone records were potentially useful as limited impeachment evidence but also potentially harmful.  Pursuing a reasonable-doubt defense and declining to introduce that evidence was a reasonable tactical decision.

Browne also argues that his attorneys' failure to object to certain testimony was deficient. He says they never objected to the Government's leading questions of Flores, *see* MNT 39, and allowed Sgt. Alvin Cardinal to offer testimony about the propensity of drug dealers to carry guns, *see id.* at 41.

Generally, a tactical decision by counsel to hold an objection at trial is not deficient.  *See United States v. Sitzmann*, 893 F.3d 811, 832 (D.C. Cir. 2018); *United States v. Catlett*, 97 F.3d 565, 570-71 (D.C. Cir. 1996).  But a constitutional defect occurs when counsel repeatedly fails to object to inadmissible evidence or misapprehends the law.  *See, e.g.*, *United States v. Glover*, 872 F.3d 625, 633-34 (D.C. Cir. 2017) (counsel deficiently failed to renew objection to testimony judge strongly disfavored even after judge alerted him that "line-by-line" objections would be necessary); *United States v. Hylton*, 294 F.3d 130, 134 (D.C. Cir. 2002) (deficient failure to object rested on counsel's misunderstanding of precedent).  Here, trial counsel's failure to object was not deficient.

Start with the "leading questions."  The Court observed Flores's testimony throughout the trial.  He spoke weak English, which meant the Government often clarified answers with summarizing and leading questions.  Had Defense made a form objection every time the Government clarified one of the witness's answers, it may have come across as derogatory nitpicking based on Flores's incomplete command of the language.  It was perfectly reasonable for the Defense to refrain, especially given that these objections would not have excluded most of Flores's inculpatory testimony.  They probably just would have prolonged it.

It was likewise reasonable for counsel to not object to Sgt. Cardinal's propensity testimony. *See* Trial Tr. 759:1-25, 760:1-6 (explaining that possession of a firearm is common among narcotics distributors). The Court qualified Cardinal as an expert, allowing him to discuss the habits of those involved in drug trafficking. *See id.* at 741:5–12. Any objection to his testimony as "speculation" would have been meritless. *Cf. United States v. Morris*, 977 F.2d 617, 622 (D.C. Cir. 1992) (noting the "well-nigh universal use of guns to protect" drug distribution operations). And it is well-established that failing to make a meritless objection cannot be the basis of an ineffective-assistance claim. *See United States v. Marshall*, 946 F.3d 591, 596 (D.C. Cir. 2020).[7]

## C.

Even if some of trial counsel's strategic decisions could be construed as "objectively unreasonable," Browne's motion would still fail. Viewing these alleged errors cumulatively, Browne has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Farrelly and Kalafat made a strategic gamble. They believed the Government's kidnapping evidence was weak and that highlighting its weakness would be more effective than presenting a defense case. That strategy meant some potentially exculpatory evidence never

---

[7] Browne asserts that a law enforcement witness perjured himself—"denying he ever spoke with Defendant [] despite [a] 90-minute interrogation." MNT 41. He suggests it was ineffective for counsel to not raise the issue in cross-examination, but he offers little explanation of why that detail was significant for impeachment purposes. Browne also says his counsel was deficient in failing to object to removal of Instruction 2.219, which related to Flores's ongoing immigration proceedings. But, it appears, Browne declined to brief the issue unless the USCIS produced relevant records. *See* MNT 41 n.4 ("Defendant will ask for leave to supplement if USCIS ends up producing anything worth arguing on this point."). Without more, the Court cannot find a deficiency in either of these non-objections.

went before the jury.  Sands, Keslow, and Impellizeri never testified.  The jury never learned

about Browne's extensive pornography searches on the return trip from Aberdeen.  But much of

this evidence was either cumulative or of limited impeachment value.  There was no dispute that

Browne was on his phone—both talking and scrolling—during much of the offense conduct.

Flores's testimony largely fit with Keslow's account, as the Defendant never threatened Flores

orally.  And Browne's counsel thoroughly impeached Flores even without this additional

evidence.  Still, Flores was a compelling, sympathetic witness and the jury believed his

testimony.  *See* Mem. Order 16, ECF No. 76 ("[T]he Court notes that it found Mr. Flores to be a

credible witness on all material points.")  There is little reason to think Defendant's new

impeachment ideas would have changed this.

More, the Defense's decision to not pursue a blind plea or pre-trial motions to exclude

narcotics evidence was probably affirmatively correct, and it certainly was not prejudicial.  At

least some evidence of Browne's dealing activities would have been admissible to prove motive

in kidnapping Flores.  *See* Fed. R. Evid. 404(b)(2).  Browne offers little explanation of how

limiting the Government to introducing (for example) 20 of the 78 pounds of marijuana would

have altered the jury's view of his case.  And, as the Defense recognized, excluding that

evidence through a plea had a clear cost: losing a less-serious count on which the jury could

reach a "compromise" conviction.

The same goes for Browne's claims about missed objections.  Had the Defense objected

to Sgt. Cardinal's propensity testimony, the Court would have overruled the objection as

baseless.  And had the Defense offered repeated form objections to the Government's

leading/clarifying questions of Flores, the Court would have simply asked the Government to

rephrase.  Neither line of objections would have materially altered the amount of inculpatory

testimony that went to the jury.  By extension, the Defense's failure to make those objections does not contribute to a cumulative finding of prejudice.

The Court notes that the Defense's gamble largely succeeded—Browne was convicted on only two of seven counts in a felony indictment, leading to a far shorter sentence than he might have faced.  On this record, Browne has not shown the Defense's alleged errors, taken together, resulted in prejudice.  In fact, the more-developed factual record suggests an alternative strategy may have hurt Browne's case.  Had the Defense decided to offer an affirmative theory of the case, and offered potentially prejudicial evidence like the pornographic searches, and blind pled to the narcotics charge, there is a very real chance Browne could have ended up with a far worse outcome.

## IV.

Browne was fortunate to have two skilled, experienced defense attorneys who managed to obtain a better trial outcome than he was ever offered in plea negotiations.  *See* Evid. Hr. Tr. (Day 2) 96:10-11 ("I didn't want to take a plea for 16 to 19 years.  So I signed no.").  Their strategy naturally entailed some trade-offs and some risks.  Even the Clarence Darrows of the defense bar lose sometimes; the Sixth Amendment promises defendants neither perfection nor success.  Browne may not have gotten either here, but he received representation that well exceeded the constitutional minimum.

The motion for a new trial is hereby DENIED.

**SO ORDERED**.

This is a final, appealable Order.


Dated: July 22, 2022                                    _____
                                                        TREVOR N. McFADDEN, U.S.D.J.